# MASTER DEVELOPMENT AGREEMENT

THIS MASTER DEVELOPMENT AGREEMENT (the "Master Development Agreement") is entered into as of the 1st day of August, 2006, by and between Aventine Renewable Energy Holdings, Inc., a Delaware corporation ("Aventine"), Nebraska Energy LLC, a Kansas limited liability company ("NELLC") and Aurora Cooperative Elevator Company, a Nebraska cooperative corporation ("Aurora Co-op") Aventine, NELLC and Aurora are sometimes referred to collectively as the "Parties" and individually, as a "Party."

## RECITALS

WHEREAS, Aventine and Aurora Co-op entered into a Letter of Intent dated April 23, 2006 with respect to the development of a portion of an industrial site located on approximately 135 acres of real property located one mile west of Aurora, Nebraska, and south and adjacent to U.S. Highway No. 34 (the "Industrial Site");

WHEREAS, Aurora Co-op has acquired an additional tract of land from NELLC, which tract of land is composed of 6 acres of real property located immediately east of and adjacent to the Industrial Site (the "NELLC Ground");

WHEREAS, the NELLC Ground has been included with the original Industrial Site for purposes of this Agreement (the NELLC tract, together with the original 135 acre Industrial Site, a total of approximately 141 acres, being referred to herein as the "Aurora West Subdivision");

WHEREAS, Aurora Co-op has caused the Aurora West Subdivision to be annexed by the City of Aurora, Nebraska, rezoned for I-2 industrial use, declared blighted and to be subdivided and platted in accordance with the Plat and Subdivision Agreement which are attached hereto as Exhibit A (collectively, the "Plat");

WHEREAS, Aventine has purchased and acquired Lots 5 and 6 of the Aurora West Subdivision, a subdivision of Aurora, Nebraska, from Aurora Co-op (the "Aventine Site");

WHEREAS, NELLC currently owns and operates an existing ethanol plant (the "NELLC Ethanol Plant") that is located immediately east and adjacent to the Aurora West Subdivision (the "NELLC Site");

WHEREAS, the Parties desire to enter into this Agreement to set forth their respective rights, privileges, obligations and undertakings insofar as the same relate to the development of the Aurora West Subdivision, the ongoing operation of the NELLC Ethanol Plant and improvements Aventine and Aurora Co-op intend to build on the Aventine Site and real estate owned by Aurora Co-op that is located within the Aurora West Subdivision, all as more particularly set forth on the Plat and the Final Site Plan and

{L0702854.3}

EXHIBIT
1

Survey which are attached hereto as Exhibit B (the "Final Site Plan") and Exhibit C (the "Survey").

NOW, THEREFORE, in consideration of the undertakings and obligations of the respective parties as hereinafter set forth in this Agreement, the receipt and sufficiency of which, if and when performed, are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## SCOPE OF PROJECT

1.1     Scope of Project.   The project envisioned by the Parties involves the following elements:

A.     The construction of a new ethanol plant by Aventine on the Aventine Site as shown on the Final Site Plan and Survey and more particularly described in Section 2.1 below (the "Aventine Ethanol Plant");

B.     The construction of a grain handling facility by Aurora Co-op on Lots 8 and 9 of the Aurora West Subdivision of the City of Aurora, Nebraska, capable of supplying yellow corn and grain sorghum to both the Aventine Ethanol Plant and the NELLC Ethanol Plant, as shown on the Final Site Plan and Survey and more particularly described in Section 3.1 below (the "Aurora Co-op Grain Handling Facility");

C.     The construction of the double track loop as shown on the Final Site Plan and Survey and more particularly described in Section 4.1 below (the "Double Track Loop"), which double track loop is connected by switches and crossover tracks to the Burlington Northern Santa Fe Railroad ("BNSF") main line, and comprised of an interior track loop (the "Interior Track Loop") and an exterior track loop (the "Exterior Track Loop") that are separated by a gravel service road located between the Interior Track Loop and the Exterior Track Loop (the "Gravel Service Road");

D.     The construction of the entry road (the "Entry Road") and an overpass (the "Overpass") connecting the county road located on the west end of the Aurora West Subdivision with a paved roadway located on the Aventine Site capable of carrying heavy truck traffic that runs from the end of the Overpass along and adjacent to the Interior Track Loop to the point at which the paved roadway intersects the south boundary of the Aurora Co-op Grain Handling Facility (the "Paved Roadway"), all as shown on the Final Site Plan and Survey, and more particularly described in Section 5.1 below .

E.     The construction by Aventine of a new grain conveyor system from the Aurora Co-op Grain Handling Facility to the Aventine Ethanol Plant as

more particularly described in Section 6.1 below (the "Aventine Conveyor System");

F.     The construction by NELLC of a new grain conveyor system from the Aurora Co-op Grain Handling Facility to the NELLC Ethanol Plant as more particularly described in Section 7.1 below (the "NELLC Conveyor System");

G.     The construction of all site improvements and infrastructure that are necessary for the construction and ongoing operation and maintenance of the Aventine Ethanol Plant, the Aurora Co-op Grain Handling Facility, the Aventine Conveyor System, the NELLC Conveyor System, the Double Track Loop, the Gravel Service Road, the Entry Road, the Paved Road and the Overpass; and

H.     The execution and delivery of the following contracts and agreements relating to the ongoing operation of the Development:

1.     A Grain Supply Agreement between Aventine and Aurora Co-op in the form attached hereto as Exhibit D (the "Aventine Grain Supply Agreement");

2.     A Grain Supply Agreement between NELLC and Aurora Co-op in the form attached hereto as Exhibit E (the "NELLC Grain Supply Agreement");

3.     A Marketing Agreement between Aventine and Aurora Co-op in the form attached hereto as Exhibit F (the "Aventine Marketing Agreement");

4.     A Marketing Agreement between NELLC and Aurora Co-op in the form attached hereto as Exhibit G (the "NELLC Marketing Agreement");

5.     A Loop Track Use and Maintenance Agreement between Aventine and Aurora Co-op in the form attached hereto as Exhibit H (the "Loop Track Agreement");

6.     An Easement and Use Agreement by and between Aventine and Aurora Co-op in the form attached hereto as Exhibit I (the "Aventine Conveyor System Easement and Use Agreement"); and

7.     An Easement and Use Agreement by and between NELLC and Aurora Co-op in the form attached hereto as Exhibit J (the "NELLC Conveyor System Easement and Use Agreement").

8.      An Easement and Use Agreement by and between NELLC, Aventine and Aurora Co-op in the form attached hereto as Exhibit K (the "NELLC Double Track Loop Easement and Use Agreement").

## ARTICLE II
## CONSTRUCTION AND OPERATION OF THE AVENTINE ETHANOL PLANT

2.1     Aventine's Agreement to Construct the Aventine Ethanol Plant.  Upon execution and delivery of this Agreement, Aventine agrees to undertake, and at its sole cost and expense, diligently pursue to completion all action which may be necessary or appropriate to site, design, construct and equip the Aventine Ethanol Facility on the Aventine Site, and except as is otherwise expressly provided in this Agreement, all of the infrastructure which is associated therewith, all in conformity with the Plat and the Final Site Plan and Survey.  The work shall specifically include, without limitation, all utilities, all work required to bring utility services to the Aventine Site and, except for the construction of the Overpass, the Gravel Road and the Paved Road, the construction of all interior streets, roads, curbs and gutters on the Aventine Site and as required by the Plat and Subdivision Agreement on public right of way located within the Aventine Site.  The foregoing obligations shall include, without limitation, the obligation, at Aventine's sole cost and expense, to obtain all authorizations, consents, licenses, permits and third party contracts, and to provide, furnish or perform all supervision, labor, materials, fixtures, supplies and/or equipment that are associated therewith.

2.2     Capacity of the Aventine Ethanol Plant.   The initial capacity of the Aventine Ethanol Facility shall be the capacity for which Aventine is able to obtain a permit from the Nebraska Department of Environmental Quality (the "NDEQ")on a "commercially reasonable best efforts" basis, provided that,   Aventine shall use its commercially reasonable best efforts to obtain a permit for a 220 million gallon per year ("MGPY") facility; and provided further that the capacity of the Aventine Ethanol Plant as initially permitted shall in no event be less than 110 MGPY.

2.3     Required Deadlines for Performance.   Subject to Aventine's right to sell the Aventine Site to Aurora Co-op pursuant to Section 10.1 (A), Aventine shall have received all permits necessary to construct the Aventine Ethanol Plant with a capacity of not less than 110 MGPY, and commenced construction on the initially permitted ethanol plant on or before November 1, 2007. The Aventine Ethanol Plant, as initially permitted, and all infrastructure associated therewith shall be complete and ready for startup and operation no later than July 1, 2009.

## ARTICLE III
## CONSTRUCTION OF AURORA CO-OP GRAIN HANDLING FACILITY

3.1     Aurora Co-op's Agreement to Construct the Aurora Co-op Grain Handling Facility.   Upon execution and delivery of this Agreement, Aurora Co-op shall immediately undertake and, at its sole cost and expense, diligently pursue to completion

all action which may be necessary or appropriate to site, design, construct and equip the Aurora Co-op Grain Handling Facility on Lots 8 and 9 of the Aurora West Subdivision, and, except as is otherwise expressly provided in this Agreement, all infrastructure that is associated therewith, all in conformity with the Plat and the Final Site Plan and Survey. When completed, said Aurora Co-op Grain Handling Facility shall be a fully operational grain elevator incorporating grain drying facilities and truck scales; facilities for receipt of grain by truck and rail and shall be capable of supplying grain to both the Aventine Ethanol Plant and the NELLC Ethanol Plant. The work shall specifically include, without limitation, all utilities and all work required to bring the utilities to the Aurora Co-op Grain Handling Facility, and all interior streets roads, curbs, and gutters on Lots 8 and 9. The foregoing obligations shall include, without limitation, the obligation, at Aurora Co-op's sole cost and expense, to obtain all authorizations, consents, licenses, permits and third party contracts and to provide, furnish or perform all supervision, labor, materials, fixtures, supplies and/or equipment that are associated therewith.

 3.2 Required Deadlines for Performance. The Aurora Co-op Grain Handling Facility shall be completed to a point such that it is capable of supplying grain to the NELLC Ethanol Plant in amounts that conform to the requirements of the NELLC Grain Supply Agreement, (the "Initial Stage of the Aurora Grain Handing Facility") on or before October 1, 2007, or, if later, the date on which the NELLC Conveyor System is fully operational. Thereafter, the Aurora Co-op Grain Handling Facility shall be completed to a point such that it is, subject to completion of the Aventine Conveyor System, and the NELLC Conveyor System, capable of supplying grain to both the NELLC Ethanol Plant Facility pursuant to the NELLC Grain Supply Agreement and the Aventine Ethanol Plant pursuant to the Aventine Grain Supply Agreement, on or before March 1, 2009, or, if later, the date on which the Aventine Conveyor System is complete and fully operational and the Aventine Ethanol Facility, as initially permitted is complete and ready for startup.

## ARTICLE IV
## CONSTRUCTION OF THE DOUBLE TRACK LOOP

 4.1 Construction of the Double Track Loop. Upon execution and delivery of this Agreement, Aurora Co-op agrees to undertake and diligently pursue to completion all action which may be necessary or appropriate to site, design, construct and equip the Interior Track Loop, the Exterior Track Loop, and the Gravel Service Road, all as shown on the Plat and the Final Site Plan and Survey. The work shall include, without limitation, all work required to extend all existing utilities from the Aventine Site and/or the Aurora West Grain Handling Facility to the Double Loop Track, the construction of all switches and crossovers between the Interior Track Loop and the Exterior Track Loop, and between the Exterior Track Loop and the main line of the BNSF. The foregoing obligations shall include, without limitation: the obligation to obtain all authorizations, consents, licenses, permits and third party contracts and to provide, furnish or perform for all supervision, labor, materials, furniture, fixtures, supplies and/or equipment associated therewith. Aurora Co-op and Aventine agree that in the event the NEDQ or any other governmental authority requires that the Gravel Service Road be paved, that the

obligations set forth in this paragraph shall include the obligation to pave the Gravel Service Road.

4.2    Aventine's Right to Review and Approve Budgets, Plans, Specifications, Contracts, Bids Quotes or Proposals. Prior to the commencement of any construction of the Exterior Track Loop, the Interior Track Loop, the switches and cross over tracks and the Gravel Service Road, the Parties shall jointly prepare and agree to separate project budgets for the construction of each of the Exterior Track Loop (the "Exterior Track Loop Budget"), the Interior Track Loop (the "Interior Track Loop Budget"), the switches and crossover tracks (the "Switches and Crossover Budget"), and the Gravel Service Road (the "Gravel Service Road Budget"). Aventine shall have the right to review and approve all plans, specifications, contracts, bids, quotes and proposals for the construction of the Exterior Track Loop, the Interior Track Loop, the switches and crossover tracks and the Gravel Service Road, including, if required, the paving of the Gravel Service Road, prior to the commencement of construction, as well as any material variations in the final budget for any such project; *provided, that,* Aventine's review and approval shall not be unreasonably conditioned, delayed or withheld by Aventine.

4.3    Required Deadline for Performance. The Double Track Loop, Gravel Service Road and the paving of the Gravel Service Road, if required, shall be completed and operational on or before November 1, 2007.

4.4    Cost Sharing.

A.    To the extent practicable, all expenses associated with the siting, planning, permitting, and design of the Interior Track Loop, the Exterior Track Loop, the switches and crossover tracks between the Interior Track Loop and the Exterior Track Loop, the switches and crossover tracks between the Exterior Track Loop and the BNSF main line, and the Gravel Service Road, including the paving of the Gravel Service Road if required, shall be included in the respective budget set forth in Section 4.2. The Parties agree and acknowledge however, that Aurora Co-op has and will incur various expenses associated with the siting, planning, permitting, and design of the Interior Track Loop, the Exterior Track Loop, the switches and crossover tracks between the Interior Track Loop and the Exterior Track Loop, the switches and crossover tracks between the Exterior Track Loop and the BNSF main line, and the Gravel Service Road, including the paving of the Gravel Service Road if required, prior to the joint preparation of and agreement on the various budgets required under section 4.2. Accordingly, Aventine agrees to reimburse Aurora Co-op for one half (½) of all such costs and expenses (including overhead)incurred prior to the joint preparation of and agreement on the various budgets, to the extent the same are reasonably and necessarily incurred by Aurora Co-op in connection with the siting, planning, permitting, and design of the Interior Track Loop, the Exterior Track Loop, the switches and crossover tracks between the Interior Track Loop and the Exterior Track Loop, the switches and crossover tracks between the Exterior Track Loop and the BNSF main line, and the Gravel Service Road, including the paving of the

Gravel Service Road if required, with Aurora Co-op bearing the remainder of such cost and expense.   In addition, Aventine shall reimburse Aurora Co-op for one half (½) of all costs and expenses (including overhead), included in the respective budgets as amended from time to time, to the extent the same are incurred by Aurora Co-op in connection with the siting, planning, permitting, and design of the Interior Track Loop, the Exterior Track Loop, the switches and crossover tracks between the Interior Track Loop and the Exterior Track Loop, the switches and crossover tracks between the Exterior Track Loop and the BNSF main line, and the Gravel Service Road, including the paving of the Gravel Service Road if required, with Aurora Co-op bearing the remainder of such cost and expense.

B.      Aventine shall reimburse Aurora Co-op for all cost and expense set forth in the Interior Track Loop Budget, as amended from time to time,  (which shall include overhead and construction supervision costs) reasonably and necessarily incurred by Aurora Co-op, to construct, install and equip the Interior Track Loop.

C.      Aurora Co-op shall bear all costs and expenses set forth in the Exterior Track Loop Budget, as amended from time to time, incurred to construct, install and equip the Exterior Track Loop.

D.      Aventine shall reimburse Aurora Co-op for one-half (½) of all costs and expenses set forth in the Gravel Service Road Budget, as it may be amended from time to time (which shall include overhead and construction supervision costs) reasonably and necessarily incurred by Aurora Co-op to construct, install and equip the Gravel Service Road, including the paving of the Gravel Service Road, if required.

E.      Aventine shall reimburse Aurora Co-op for one-half (½) of all costs and expenses set forth in the Switches and Crossover Budget, as amended from time to time, (which shall include overhead and construction supervision costs) reasonably and necessarily incurred by Aurora Co-op to construct, install and equip  the switches and crossover tracks between the Interior Track Loop and the Exterior Track Loop and between the Exterior Track Loop and the BNSF main line, with Aurora Co-op bearing the rest of such cost and expense.

F.      Anything herein to the contrary notwithstanding, the Parties agree that even if a cost or expense that is incurred by Aurora Co-op in connection with any one more of the foregoing projects is not included in the budget for that project Aurora Co-op will nevertheless be entitled to be reimbursed for such cost or expense to the extent otherwise provided above if the Parties agree in their reasonable discretion and in good faith that such cost or expense was reasonable and necessary given the circumstances then existing.

G.     All costs and expenses incurred by Aurora Co-op that are to be reimbursed by Aventine, shall be billed to Aventine by Aurora Co-op on a monthly basis, and be paid by Aventine to Aurora Co-op within ten (10) days following the date of receipt of each such statement. Any amounts which are not paid when due shall thereafter bear interest at a rate of fifteen percent (15%) per year, or if lower, the maximum rate permitted by applicable law, until paid in full.

H.     Aurora Co-op shall at all times maintain accurate books and records relating to any costs or expenses for which Aventine is required to reimburse Aurora Co-op under this Agreement and Aventine, at its sole cost and expense, shall have the right to inspect, and if desired, audit any and all books and records of Aurora Co-op that pertain to any costs or expenses for which Aventine is required to reimburse Aurora Co-op.

## ARTICLE V
## CONSTRUCTION OF ENTRY ROAD, OVERPASS AND PAVED ROADWAY

5.1     Construction of Entry Road, Overpass and the Paved Roadway.  Upon execution and delivery of this Agreement, Aurora Co-op agrees to undertake and diligently pursue to completion all action which may be necessary or appropriate to site, design, construct and equip the Entry Road, the Overpass and the Paved Roadway Road, as shown on the Plat and the Final Site Plan and Survey.  The foregoing obligations shall include, without limitation, the obligation to obtain all authorizations, consents, licenses, permits, and third party contracts and to provide, furnish or perform all supervision, labor, materials, fixtures, supplies and/or equipment associated therewith.

5.2     Aventine's Right to Review and Approve All Budgets, Plans, Specifications, Contracts, Bids, Quotes and Proposals.  Prior to the commencement of any construction of the Entry Road, the Overpass and the Paved Roadway, the Parties shall jointly prepare and agree to separate project budgets for the construction of each of the Entry Road (the "Entry Road Budget"), the Overpass (the "Overpass Budget") and the Paved Roadway (the "Paved Roadway Budget").  Aventine shall have the right to review and approve all plans, specifications, contracts, bids, quotes and proposals for the construction of the Entry Road, the Overpass and the Paved Road prior to commencement of construction, as well as any material variations in the final budget for any such project; *provided, that,* Aventine's review and approval shall not be unreasonably conditioned, withheld or delayed, and provided further that the Entry Road, the Overpass and the Paved Road shall in all events be constructed pursuant to the Subdivision Agreement and in conformity with the design standards for the City of Aurora, Nebraska.

5.3     Required Deadline for Performance.  The Entry Road, the Overpass and the Paved Roadway shall be complete and operational on or before October 1, 2007.

{L0702854.3}                                    - 8 -

5.4    Cost Sharing.

A.    To the extent practicable, all expenses associated with the siting, planning, permitting, and design of the Paved Roadway shall be included in the Paved Roadway Budget set forth in Section 5.2.    The Parties agree and acknowledge however, that Aurora Co-op has and will incur various expenses associated with the siting, planning, permitting, and design of the Paved Roadway prior to the joint preparation of and agreement on the Paved Roadway Budget required under section 5.2.  Accordingly, Aventine agrees to reimburse Aurora Co-op for all costs and expenses (including overhead) incurred prior to the joint preparation of and agreement on the various budgets, to the extent the same are reasonably and necessarily incurred by Aurora Co-op in connection with the siting, planning, permitting, and design of the Paved Roadway.    In addition, Aventine shall reimburse Aurora Co-op for all costs and expenses, included in the Paved Roadway Budget, as it may be amended from time to time, reasonably and necessarily incurred by Aurora Co-op in connection with the siting, planning, permitting, construction, installation and equipping of the Paved Roadway.

B.    To the extent practicable, all expenses associated with the siting, planning, permitting, and design of the Entry Road and Overpass shall be included in the Entry Road Budget and the Overpass Budget set forth in Section 5.2. The Parties agree and acknowledge however, that Aurora Co-op has and will incur various expenses associated with the siting, planning, permitting, and design of the Entry Road and the Overpass prior to the joint preparation of and agreement on the Entry Road Budget and Overpass Budget required under section 5.2. Accordingly, Aventine agrees to reimburse Aurora Co-op for one-half (1/2) all costs and expenses (including overhead) incurred prior to the joint preparation of and agreement on the various budgets, to the extent the same are reasonably and necessarily incurred by Aurora Co-op in connection with the siting, planning, permitting, and design of the Entry Road and Overpass.    In addition, Aventine shall reimburse Aurora Co-op for one-half (1/2) of all costs and expenses, included in the Entry Road Budget and the Overpass Budget, as amended from time to time, in connection with the siting, planning, permitting, design, construction, installation and equipping of the Entry Road and the Overpass, with Aurora Co-op bearing the rest of such cost and expense.

C.    Anything herein to the contrary notwithstanding, the Parties agree that even if a cost or expense that is incurred by Aurora Co-op in connection with any one more of the foregoing projects is not included in the budget for that project Aurora Co-op will nevertheless be entitled to be reimbursed for such cost or expense to the extent otherwise provided above if the Parties agree in their reasonable discretion and in good faith that such cost or expense was reasonable and necessary given the circumstances then existing.

D.    All costs and expenses incurred by Aurora Co-op that are to be reimbursed by Aventine shall be billed to Aventine on a monthly basis, and shall

be paid by Aventine to Aurora Co-op within ten (10) days following the date of receipt of each such statement. Any amounts which are not paid when due shall thereafter bear interest at a rate of fifteen percent (15%) per year, or if lower, the maximum rate permitted by applicable law, until paid in full.

E.     Aurora Co-op shall at all times maintain accurate books and records of all costs or expenses for which Aventine is required to reimburse Aurora Co-op, and Aventine, at its sole cost and expense, shall have the right to inspect, and if desired, audit all books and records of Aurora Co-op that pertain to any costs or expenses for which Aventine is required to reimburse Aurora Co-op.

## ARTICLE VI
## CONSTRUCTION OF AVENTINE GRAIN CONVEYOR SYSTEM

6.1     Construction of Aventine Grain Conveyor System. Upon execution and delivery of this Agreement, Aventine shall undertake and, at its sole cost and expense, diligently pursue to completion all action which may be necessary or appropriate to site, design, construct, install and equip a conveyor system capable of transporting all of the grain that Aurora Co-op is required to supply to the Aventine Ethanol Plant pursuant to the Aventine Grain Supply Agreement from the Aurora Co-op Grain Handling Facility to the Aventine Ethanol Plant. The Aventine Conveyor System shall originate at the Aurora Co-op Grain Handling Facility with an automated bulk scale and grain sampling system and, when complete, shall be capable of transporting grain to the Aventine Ethanol Plant at a rate of not less than 20,000 bushels per hour. The grain conveyor system shall include storage for at least 1,000,000 bushels of grain at the Aventine Ethanol Plant. The foregoing obligation shall include, without limitation, the obligation to obtain, at Aventine's sole cost and expense, all authorizations, consents, licenses, permits and third party contracts and to provide, furnish or perform all labor, supervision, materials, furniture, fixtures and equipment associated therewith.

6.2     Aurora Co-op's Right to Review and Approve the Plans, Specifications, Location and Construction Schedule of the Aventine Conveyor System. Aurora Co-op shall have the right to review and approve the plans and specifications of the Aventine Conveyor System, the location of the Aventine Conveyor System on Aurora Co-op's property and the construction scheduling for that portion of the Aventine Conveyor System that is located on Aurora Co-op's property, provided only that such review and approval shall not be unreasonably conditioned, delayed or withheld by Aurora Co-op.

6.3     Deadline for Performance. The Aventine Conveyor System shall be completed and fully operational on or before March 1, 2009, or, if later, the date on which the Aventine Ethanol Facility is complete and ready for startup.

### ARTICLE VII
### CONSTRUCTION OF NELLC GRAIN CONVEYOR SYSTEM

7.1     Construction of NELLC Grain Conveyor System.  Upon execution and delivery of this Agreement, NELLC shall undertake and, at its sole cost and expense, diligently pursue to completion all action which may be necessary or appropriate to site, design, construct, install and equip a conveyor system capable of transporting all of the grain that Aurora Co-op is required to supply to the NELLC Ethanol Facility pursuant to the NELLC Grain Supply Agreement, from the Aurora Co-op Grain Handling Facility to the NELLC Ethanol Plant.  The grain conveyor system shall originate at the Aurora Co-op Grain Handling Facility with an automated bulk scale and grain sampling system and, when complete, shall be capable of transporting grain to the NELLC Ethanol Plant at a rate of not less than 5,000 bushels per hour.  The NELLC Conveyor System shall include storage for at least 70,000 bushels of grain at the NELLC Ethanol Plant.  The obligations shall include, without limitation, the obligation to obtain, at NELLC's sole cost and expense, all authorizations, consents, licenses, permits and third party contracts and to provide, furnish or perform all labor, supervision, materials, furniture, fixtures and equipment associated therewith.

7.2     Aurora Co-op's Right to Review and Approve the Plans, Specifications, Location and Construction Schedule of the NELLC Conveyor System.  Aurora Co-op shall have the right to review and approve the plans and specifications of the NELLC Conveyor System, the location of the NELLC Conveyor System on Aurora Co-op's property and the construction scheduling for that portion of the NELLC Conveyor System that is located on Aurora Co-op's property, provided only that such review and approval shall not be unreasonably conditioned, delayed or withheld by Aurora Co-op.

7.3     Deadline for Performance.  The NELLC Conveyor System shall be completed and fully operational on or before October 1, 2007, or, if later, the date on which the Initial Stage of the Aurora Co-op Grain Handling Facility is completed and fully operational.

### ARTICLE VIII
### EXECUTION AND DELIVERY OF ADDITIONAL CONTRACTS AND
### AGREEMENTS

8.1     Execution and Delivery of Additional Contracts and Agreements Between Aventine and Aurora Co-op.  On or before the execution of this Agreement, Aventine and Aurora Co-op shall each execute, enter into, acknowledge if required, and deliver to one another the following contracts and agreements:  the Aventine Grain Supply Agreement; the Aventine Marketing Agreement, the Loop Track Use and Maintenance Agreement, and the Aventine Conveyor System Easement and Use Agreement.

8.2     Execution and Delivery of Additional Contracts and Agreements Between NELLC and Aurora Co-op.  On or before the execution of this Agreement, NELLC and

Aurora Co-op shall each execute, enter into, acknowledge if required, and deliver to one another the following contracts and agreements: the NELLC Grain Supply Agreement, the NELLC Marketing Agreement, and the NELLC Conveyor System Easement and Use Agreement.

8.3   Execution and Delivery of Additional Contracts and Agreements Between Aventine, NELLC and Aurora Co-op.   On or before the execution of this Agreement, Aventine, NELLC and Aurora Co-op shall each execute, enter into, acknowledge if required, and deliver to each other the Double Track Loop Usage Easement and Use Agreement.

**ARTICLE IX**
**AGREEMENT WITH RESPECT TO EXISTING IRRIGATION WELLS**

9.1   Agreement With Respect to Existing Irrigation Wells.   The parties acknowledge that Aventine is the owner of an irrigation well that is presently located on the Aventine Site (the "Aventine Well"), and that Aurora Co-op currently owns a second irrigation well located north and west of the Aventine Well on a portion of the Aurora West Subdivision owned by Aurora Co-op (the "Aurora Co-op Well"). The approximate location of the Aventine Well is as indicated on the map attached hereto as Exhibit L and by this reference incorporated herein. The parties also acknowledge that in order to operate the Aventine Ethanol Plant, Aventine will require a continuous water source capable of producing a minimum of 2,300 gallons of water per minute. In connection with the construction of the Exterior Loop Track, the parties further acknowledge that it will be necessary for Aurora Co-op to abandon the Aurora Co-op Well. The parties hereby agree that Aventine shall, at its sole cost and expense, drill and equip a new well on the Aventine Site (the "New Well"), provided only that such New Well shall in all events be at least 1000 feet from the East side of the Interior Track Loop that runs adjacent to Lots 3 and 4 on the west end of the Industrial Site, as shown on Exhibit L.

**ARTICLE X**
**PERFORMANCE PENALTIES**

10.1   Aventine Penalty for Failure to Obtain Permits and Commence Construction on the Aventine Ethanol Plant on or before November 1, 2007.   Unless extended in writing by Aurora Co-op in its sole discretion, pursuant to Aventine's request prior to November 1, 2007, Aventine shall have received all governmental and third party permits including, without limitation, an air construction permit from the NDEQ and shall have commenced construction on the Aventine Ethanol Plant on or before November 1, 2007 (the "Aventine Construction Permit Deadline"). In the event that Aventine does not receive such permits or fails to commence construction on the Aventine Ethanol Plant on or before November 1, 2007, and provided Aurora Co-op has not agreed in writing to extend such Aventine Construction Permit Deadline pursuant to Aventine's request, Aventine shall, within five (5) business days of November 1, 2007,

notify Aurora Co-op in writing of Aventine's election (the "Aventine Election"), in its sole discretion, to either:

      A.    Exercise its right, granted hereby, to sell to Aurora Co-op; and in such case, Aurora Co-op shall be obligated to purchase from Aventine the Aventine Site, specifically including all fixtures, equipment and improvements located thereon, for the purchase price of $16,500 per acre, and to consummate such transaction within thirty (30) days thereafter, provided that Aventine shall convey marketable title to Aurora Co-op free and clear of all liens or encumbrances resulting from the actions or omissions of Aventine or its permitted assigns during their ownership of the Aventine Site, except easements, covenants or restrictions of record; or

      B.    Agree to continue to pursue the permits; in which event, Aventine shall accrue penalties in the amount of $138,889 per month for each month beginning on January 1, 2008 and continuing thereafter until Aventine obtains such permits and actually commences construction on the Aventine Ethanol Plant (the "Aventine Penalty"). The Aventine Penalties shall be paid to Aurora Co-op as provided in Section 10.2 below.

The Parties agree and acknowledge that in the event that Aventine elects to exercise its right to sell the Aventine Site to Aurora Co-op pursuant to the provisions of Section 10.1.A above, the exercise of such right shall not relieve Aventine from any obligation which it may have to reimburse Aurora Co-op for costs and expenses incurred by Aurora Co-op pursuant to Section 4.4 subsections (A), (B), (D), (E) and (F) and Section 5.6 subsections (A) and (B) of this Master Development Agreement, through the date of the Aventine Election. The Parties further agree that in the event Aventine shall fail to give Aurora Co-op written notice of its election within the time proscribed above, Aventine will be deemed to have elected the option set forth in Section 10.1.B above.

    10.2    <u>Aventine's Penalty for Failure to Complete Aventine Ethanol Plant On or Before July 1, 2009</u>. Unless (i) Aventine exercises its option to sell the Aventine Site to Aurora Co-op, as provided in Section 10.1 (A) above or (ii) unless prior to July 1, 2009, pursuant to Aventine's request, Aurora Co-op, in its sole discretion extends such date,, the Aventine Ethanol Plant shall be completed and fully operational for the production of a minimum of 110 MGPY of Ethanol, on or before July 1, 2009. In the event Aventine elects to sell the Aventine Site to Aurora Co-op pursuant to Section 10.1.A, or in the event the Aventine Ethanol Plant is fully operational on or before July 1, 2009, or if later, the date on which Aurora Co-op extends such deadline in its sole discretion pursuant to the foregoing sentence, any amounts due to Aurora Co-op as Aventine Penalties under the provisions of Section 10.1.B of this Agreement shall be waived and Aventine shall have no further obligation to pay Aurora Co-op the Aventine Penalties that have accrued and remain unpaid as of such date. In the event that the Aventine Ethanol Plant is not complete and fully operational on July 1, 2009, or if later, the date to which Aurora Co-op extends such deadline in it's sole discretion, as provided above, and provided Aventine has not previously elected to sell the Aventine Site to Aurora Co-op pursuant to

Section 10.1.A, then, in such event, all of the Aventine Penalties accrued through June 30, 2009 pursuant to Section 10.1.B shall be immediately due and payable, and shall be paid by Aventine to Aurora Co-op within three (3) business days of July 1, 2009. Thereafter the Aventine Penalties shall continue to accrue at a rate of $138,889 per month until the Aventine Ethanol Plant is complete and fully operational; provided, however, in no event shall the amount of the Aventine Penalties paid pursuant to this Article X exceed an aggregate amount of $5,000,000. All Aventine Penalties which accrue on or after July 1, 2009 shall be billed to Aventine monthly by Aurora Co-op and shall be due and payable to Aurora Co-op by Aventine within ten (10) days following receipt of such billing.

10.3   Aurora Co-op's Penalty for Failure to Complete the Aurora Co-op Grain Handling Facility On or Before March 1, 2009. Unless extended in writing by Aventine pursuant to Aurora Co-op's request prior to March 1, 2009, and subject to the completion of the Aventine Conveyor System, the Aurora Co-op Grain Handling Facility shall be complete and fully operational on or before March 1, 2009, or if later, the date on which the Aventine Ethanol Plant is complete and ready for startup. In the event the Aurora Co-op Grain Handling Facility is not complete and fully operational on such date, and, provided Aventine has not previously elected to sell the Aventine Site to Aurora Co-op pursuant to Section 10.1.A, then, in such event, Aurora Co-op shall incur and agrees to pay to Aventine a penalty in the amount of $138,889.00 per month until the Aurora Co-op Grain Handling Facility is complete and fully operational; provided, however, that in no event shall the amount of the Aurora Co-op Penalty paid pursuant to this Article X exceed an aggregate amount of $5,000,000.00 (the "Aurora Co-op Penalty"). The Aurora Co-op Penalty shall be billed to Aurora Co-op by Aventine on a monthly basis and shall be due and payable to Aventine by Aurora Co-op within 10 days following Aurora Co-op's receipt of such billing.

10.4   Exclusive Remedies. The penalties set forth in this Article X shall be the exclusive remedies of the Parties for any breach of Sections 2.3, 3.2, 4.5, 5.5 or 6.3 of this Agreement..

# XI
## ADDITIONAL COVENANTS AND AGREEMENTS RELATING TO CONSTRUCTION REQUIREMENTS

11.1   Construction Requirements. All construction activity undertaken by any one or more of the parties to this Agreement shall conform to the following requirements:

A.   Progress Reports and Scheduling. The Parties shall make reasonable efforts to keep one another informed as to their respective progress and construction schedules on at least a monthly basis, and shall perform all work in a manner that is reasonably calculated to cause as little disruption as is reasonably possible to one another and to other owners of property within the Aurora West Subdivision.

B.     Conformity to Plans and Specifications.  To the extent plans and specifications are subject to approval of another Party , all work shall be in substantial conformity with the plans and specification as previously approved by such Party.

C.     Right to Observe and Inspect.  Subject to complying with such security and safety procedures as have been established pursuant to subparagraphs F and G below, a Party who has the right to approve the plans and specifications for any improvements provided for in this Agreement shall have the right to have its authorized agents or representatives observe and inspect all such work as it progresses.

D.     Quality of Work.  All work shall be performed in a good and workmanlike manner, using quality materials.

E.     Compliance with Applicable Laws and BNSF and Insurance Requirements.  All work shall be performed in compliance with all laws, rules, orders, ordinances, directions, regulations and all BNSF and insurance requirements applicable thereto.

F.     Health and Safety.  Each Party shall maintain the work sites under their control in good order, incompliance with all applicable laws relating to industrial hygiene and workplace safety, and otherwise in a safe, neat and clean condition, free from refuse or debris.

G.     Security.  Each Party shall be responsible for providing all security measures which are necessary, in its sole discretion, to keep the property which it owns within the Aurora West Subdivision and any work site thereon that is under its control as well as any improvements or personal property located thereon, including, without limitation, construction materials, tools, supplies and equipment secure from theft, damage or vandalism.

H.     Environmental.  Except for the use and storage of materials in compliance with all applicable Environmental Law, as hereinafter defined, no Party shall engage in any violation of Environmental Law, insofar as the same relate to any real property located within the Aurora West Subdivision, the NELLC Site or the construction or operation of any of the improvements constructed or operated by such Party thereon.  Further, and except as noted above, none of the Parties shall engage in, commit or permit the storage, holding, existence, release, emission, discharge, generation, processing, abatement, removal, disposition, handling or transportation of any Hazardous Substance, as hereinafter defined, from, under, into, on, or otherwise relating to any such real property located within the Aurora West Subdivision, the NELLC Site or the construction or operation of any of the improvements constructed or operated by such Party thereon, or engage in any other activity or permit any occurrence that could reasonably be expected to cause any such event to exist.  For purposes of

this Agreement, the term "Environmental Law" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601 *et seq*; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6902 *et seq*; the Clean Water Act, 33, U.S.C. Section 1251 et seq., the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 1801 *et seq*; the Federal Water Pollution Control Act, as amended, 33 U.S.C. §1251, *et seq.*, as said laws have been supplemented or amended to date, the regulations promulgated pursuant to said laws; and any other federal, state or local law, statute, rule, regulation or ordinance which regulates or proscribes the use, storage, disposal, presence, cleanup, transportation or release or threatened release into the environment of any Hazardous Substance.   For purposes of this Agreement, the term "Hazardous Substance" means any substance which is (i) designated, defined, classified or regulated as a hazardous substance, hazardous material, hazardous waste, pollutant or contaminant under any Environmental Law, (ii) petroleum hydrocarbon, including crude oil or any fraction thereof and all petroleum products; (iii) PCBs, (v) lead, (v) asbestos, (vi) flammable explosives, (vii) infectious materials, (viii) toxic mold, or (ix) radioactive materials.

   I. <u>Books and Records.</u>  , Each Party shall maintain a true, complete and correct set of files, books and records of all business activities and operations conducted by such Party in connection with such Party's performance under this Agreement, including, without limitation, copies of all contracts for goods and services furnished to or by such Party in connection herewith.

   J. <u>Payment of Taxes and Expenses.</u>  Each Party shall cause to be paid when due all taxes, charges and other amounts for which they are responsible under this Agreement and which, if not timely paid, would constitute a lien on their respective real or personal property or the real property of another Party on which such Party is required to construct or install improvements pursuant to the terms of this Agreement.

  11.2 <u>Construction Easements.</u> Each Party hereto (in such capacity, a "Grantor") agrees to grant to each other Party (in such capacity, a "Grantee") and their respective officers, directors, employees, agents, contractees and representatives such easements, including, without limitation, easement of ingress and egress, and the right to use or occupy on a temporary basis Grantor's real property to the extent the same are reasonably necessary in order to permit the Grantee to construct and install the improvements that Grantee is required to construct and install on the Aurora West Subdivision pursuant to the terms of this Agreement, provided only that the Grantee agrees:  to give reasonable advance notice of such entry, occupancy and/or use; to carry out and conduct all such activity in a manner that is calculated to cause as little disruption as is reasonably possible to the Grantor's use and enjoyment of such real property; to prosecute such work in accordance with the provisions of Section 11. 1 above; and to repair any material damage which may be caused to the Grantor's real estate or any

improvements located thereon as a result of such activity and shall otherwise restore such property to its original condition, ordinary wear and tear excepted.

11.3 <u>Utility Easements</u>. Each Party hereto (in such capacity, a "Grantor") agrees to grant each other Party hereto (in such capacity, a "Grantee") such utility easements on, over, upon and under the Grantor's real property as may be reasonable required to permit the Grantee to construct and operate the improvements that the Grantee is required to construct and install on the Aurora West Site pursuant to this Agreement, provided only that the requesting Party shall locate all such utility services in a manner that is calculated to cause as little interference as possible to the Grantor's use and enjoyment of the real property, and provided further that Grantor agrees to: give reasonable advance notice of such entry, occupancy and/or use; to carry out and conduct all such activity in a manner that is calculated to cause as little disruption as is reasonably possible to the Grantor's use and enjoyment of such real property; to prosecute such work in accordance with the provisions of Section 11. 1 above; and to repair any material damage which may be caused to the Grantor's real estate or any improvements located thereon as a result of such activity and shall otherwise restore such property to its original condition, ordinary wear and tear excepted.

11.4 <u>Resolution of Disputes Regarding Required Approvals and Easements</u>. In the event a Party submits any proposed sites, locations, plans, specifications or requests for easements to another Party for approval, then such approval shall be deemed to be granted unless the other Party notifies the requesting Party within thirty (30) days of their disapproval in writing and includes a statement setting forth the reasons for such disapproval. In the event any such request is not approved any dispute with respect thereto shall be decided by the majority vote of a panel of three (3) Professional Engineers, one of whom shall be chosen by the Party to which the request is addressed, one of whom shall be chosen by the Party making the request, and the third of which shall be chosen by the first two Engineers. Such Engineers shall determine the controversy and notify the Parties in writing of their determination within thirty (30) days after the controversy has first been submitted to the panel. All expenses relative to the Engineer chosen by a Party shall be borne by that Party, and all expenses relative to the third Engineer shall be shared equally by the Parties to the controversy.

**ARTICLE XII**
**INSURANCE**

12.1 <u>Required Insurance Coverage</u>. For and during the Term of this Agreement, each Party hereto shall purchase and maintain in force the following insurance coverages:

    A. <u>Commercial Property Insurance</u>. "Commercial Property Insurance" including, as is appropriate in the circumstances, "Builders Risk" on all improvements required to be constructed by the Party on property located within the Aurora West Subdivision, and in the case of NELLC, the NELLC Site,

and "Business Personal Property Coverage" on all personal property owned by the Party and located on the Aurora West Subdivision, and in the case of NELLC, the NELLC Site, including without limitation all fixtures, furniture, construction materials, supplies, tools and equipment that are located thereon. The insurance shall at a minimum provide "Special Perils" coverage and be in an amount equal to the full replacement value of all such improvements, fixtures, furniture, construction materials, supplies, tools and equipment. In addition, each such policy of insurance shall contain a waiver of subrogation endorsement in favor of each of the other parties to this Agreement and their respective officers, directors, shareholders, members, managers, partners, employees, agents, contractees, representatives and invitees.

      B.   <u>Comprehensive General Liability Insurance</u>. "Comprehensive Commercial General Liability Insurance," and, if necessary, commercial umbrella insurance with an aggregate limit of not less than $10,000,000.00 for each occurrence. Each such policy, including any such commercial umbrella insurance, if any, shall include each of the other Parties to this Agreement as an additional named insured, and shall apply as primary insurance with respect to any other insurance or self-insurance programs maintained by any such other Party. If any such policy states that it is excess or pro rata, the policy shall be endorsed to be primary with respect to any additional insurance of any such other Parties.

      C.   <u>Workers Compensation Insurance</u>. Workers compensation and employers liability insurance as may be required by the State of Nebraska.

    12.2  <u>Proof of Insurance</u>. Upon execution of this Agreement, and annually on renewal of the required insurance, each Party shall furnish the other Parties to this Agreement with a certificate(s) of insurance, executed by a duly authorized representative of each insurer, showing compliance with the insurance requirements set forth above. All certificates shall provide for thirty (30) days written notice to the other Party prior to the cancellation or material change of any insurance referred to therein. Failure of a Party to demand such certificate or other evidence of full compliance with these insurance requirements or failure of a Party to identify a deficiency from evidence that is provided shall not be construed as a waiver of the other Party's obligation to maintain such insurance. If any Party fails to maintain the insurance as set forth herein, the other Parties shall have the right, but not the obligation, to purchase said insurance at the other Party's expense, and all amounts so paid shall be immediately due and payable and shall bear interest at a rate of fifteen percent (15%) per annum or if less, the maximum rate permitted by applicable law until paid in full. By requiring insurance herein, none of the Parties represent that coverage or limits will necessarily be adequate to protect the other Parties and such coverage and limits shall not be deemed as a limitation on their liability under any of the indemnities granted in this Agreement.

## ARTICLE XIII
## PARTIES' RIGHTS IN CERTAIN CIRCUMSTANCES

13.1    Aurora's <u>Option to Repurchase in Certain Events</u>.    In the event (i) Aventine notifies Aurora Co-op in writing that Aventine intends to abandon the development of the Aventine Ethanol Plant, as contemplated in this Agreement; or (ii) Aventine is in breach of its obligation to pay any of the Aventine Penalties due Aurora Co-op pursuant to the performance guarantees that are set forth in Sections 10.1 and 10.2 above; and provided Aurora Co-op is not itself then in material breach of any of the obligations or undertakings required to be observed or performed by Aurora Co-op hereunder, then, in addition to and not in limitation or derogation of any other rights Aurora Co-op may have hereunder or otherwise at law or in equity, Aurora Co-op shall have the right and option, in its sole discretion, at any time thereafter to repurchase the Aventine Site and all fixtures, equipment and improvements located thereon from Aventine for an aggregate amount equal to $16,500.00 per acre increased by the aggregate amount, if any, Aventine has paid Aurora Co-op to reimburse Aurora Co-op for the cost and expense incurred by Aurora Co-op to construct the Double Loop Tracks, the Gravel Service Road, the Switches and Crossover Tracks, the Paved Roadway Road, Entry Road and the Overpass, and reduced by the aggregate amount, if any, of the any of the Aventine Penalties that have accrued pursuant to this Agreement to the date on which such option is exercised as a result of Aventine's failure to meet the performance criteria set forth above.    In the event Aurora Co-op elects to exercise this option, the transaction shall close within thirty (30) days of the date on which the option is exercised, Aventine shall convey marketable title to the Aventine Site to Aurora Co-op at the closing, free and clear of liens or encumbrances, and the purchase price so determined shall be payable by Aurora Co-op to Aventine, together with interest at the applicable federal rate, in equal annual installments over a period of ten (10) years, commencing on the date on which the repurchase is closed.    In the event Aurora Co-op elects to exercise its right to repurchase the Aventine Site, any Aventine Penalties relating to Aventine's continued failure to meet the performance criteria set forth above will cease to accrue as of the date on which such option is exercised.    The parties agree that Aurora Co-op shall have the right to record a memorandum of this Option with the Hamilton County Register of Deed's office, Hamilton County, Nebraska in order to provide record notice of Aurora Co-op's rights hereunder.    Such memorandum shall be in the form of Exhibit K which is attached hereto, and which the parties will execute at the Closing.

## ARTICLE XIV
## RELATIONSHIP OF THE PARTIES

14.1    <u>Independent Contractor Status</u>.    The relationship between the Parties to this Master Development Agreement shall be and at all times remain that of independent contractors.    Nothing herein shall be deemed or construed to create a joint venture, partnership or other legal relationship of any name, nature or description as between the Parties hereto.    Each Party shall hire, discharge, and supervise its on-site employees, independent contractors and labor necessary to properly perform the duties and functions

of such Party as set forth herein. Such personnel shall be deemed to be the employees, independent contractors or laborers of the Party which hired them for all purposes, and except to the extent such costs or expenses are required to be reimbursed hereunder, all costs or expenses associated therewith or incidental thereto shall be and remain the sole responsibility of the Party who engaged such party, including without limitation, salary and wages, or proportionate shares thereof, payroll taxes, employee's health insurance, 401(k), workers compensation, termination benefits payable pursuant to Nebraska law and all other benefits of the particular Party's employees who are located on-site, including temporary employees performing on-site services in connection with the project.

## ARTICLE XV
## REPRESENTATIONS AND WARRANTIES

15.1    Representations and Warranties of Aurora Co-op. Aurora Co-op hereby represents and warrants to Aventine and NELLC that each of the following representations and warranties are true and correct in all material respects as of the date of this Agreement:

A.    Organization, Qualification and Power.   Aurora Co-op is a cooperative corporation duly organized, validly existing, and in good standing under the laws of the State of Nebraska, is duly authorized to do business in the State of Nebraska, and has full power and authority to conduct its businesses and to own and use the properties and assets owned and used by it.

B.    Authority/Validity.   Aurora Co-op has all necessary power and authority to execute, enter into, and deliver this Agreement and each of the contracts, agreements, certificate or other instruments that are attached hereto, and has taken all action necessary (including obtaining all requisite authorization from its shareholders and board of directors) to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated herein and therein. This Agreement and each of the contracts, agreements, certificate or other instruments that are attached hereto has been duly executed and delivered by Aurora Co-op; are legal, valid, and binding obligations of Aurora Co-op; and upon complete execution and delivery will be enforceable against Aurora Co-op in accordance with their terms.

C.    Noncontravention.   Neither the execution nor delivery of this Agreement or any of the contracts, agreements, certificate or other instruments that are attached hereto, nor the consummation of the transactions contemplated herein or therein will: (i) violate or result in a conflict with the Articles of Incorporation or Bylaws of Aurora Co-op; (ii) violate any constitution, statute, regulation, rule, injunction, judgment or other restriction of any government, governmental agency or court (collectively, "Laws or Regulations")to which the Aurora Co-op is subject; or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to

accelerate, terminate, modify or cancel or require any notice under any note, deed, security agreement, mortgage, agreement contract, lease, license, instrument or other arrangement to which the Aurora Co-op is a , by which any of its properties are bound, or result in the imposition of a lien or encumbrance upon any of its properties.

D.    Litigation.  No litigation has been served upon Aurora Co-op, or to Aurora Co-op's knowledge is threatened with respect to the this Agreement, the Aurora West Subdivision or any action required to be taken by Aurora Co-op in connection with any of the transactions contemplated herein, and there are no pending, or to Aurora Co-op's knowledge, threatened, actions, suits or investigations with regard to condemnation, zoning, fire, safety, health, environmental or other conditions which relate thereto or would reasonably be expected to have a material adverse affect thereon.

E.    Third Party Consents.  Except for governmental permits, consents or other actions required with respect to zoning, platting, subdivision, and construction; actions required to transfer the Irrigation Wells or obtain a permit for their use for industrial purposes; and except for the BNSF approval of the Double Track Loop and Gravel Service Road, as referenced in Section 4.1 above, no consent of any third party is required in order for Aurora Co-op to perform the obligations and undertakings required to be performed by it under this Agreement or under any other contract, agreement, certificate or other instrument that is attached hereto.

15.2    Representations and Warranties of Aventine.  Aventine hereby represents and warrants to Aurora Co-op and NELLC that each of the following representations and warranties are true and correct in all material respects as of the date of this Agreement:

A.    Organization, Qualification and Power.  Aventine is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware, is duly authorized to do business in the State of Nebraska, and has full power and authority to conduct its businesses and to own and use the properties and assets owned and used by it.

B.    Authority/Validity.    Aventine has all necessary power and authority to execute, enter into, and deliver this Agreement and each of the contracts, agreements, certificate or other instruments that are attached hereto, and has taken all action necessary (including obtaining all requisite authorization from its shareholders and board of directors) to perform its obligations hereunder and thereunder and consummate the transaction contemplated herein and therein. This Agreement and each of the contracts, agreements, certificate or other instruments that are attached hereto has been duly executed and delivered by Aventine; are legal, valid, and binding obligations of Aventine; and upon complete execution and delivery will be enforceable against Aventine in accordance with their terms.

{L0702854.3}                          - 21 -

C. Noncontravention. Neither the execution nor delivery of this Agreement or any of the contracts, agreements, certificate or other instruments that are attached hereto, nor the consummation of the transactions contemplated herein or therein will: (i) violate or result in a conflict with the Articles of Incorporation or Bylaws of Aventine; (ii) violate any Laws or Regulations to which Aventine is subject; or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel or require any notice under any note, deed, security agreement, mortgage, agreement contract, lease, license, instrument or other arrangement to which Aventine is a party, by which any of its properties are bound, or result in the imposition of a lien or encumbrance upon any of its properties.

D. Litigation. No litigation has been served upon Aventine, nor to Aventine's knowledge is threatened with respect to the this Agreement, the Aurora West Subdivision, the Aventine Site or any action required to be taken by Aventine in connection with any of the transactions contemplated herein, and there are no pending, nor to Aventine's knowledge, threatened, actions, suits or investigations with regard to condemnation, zoning, fire, safety, health, environmental or other conditions which relate thereto or would reasonably be expected to have a material adverse affect thereon.

E. Third Party Consents. Except for governmental permits, consents or other actions required with respect to zoning, platting, subdivision and construction, actions required to transfer the Irrigation Wells or obtain a permit for their use for industrial purposes, and except for the BNSF approval of the Double Track Loop and Gravel Service Road, as referenced in Section 4.1 above, no consent of any third party is required in order for Aventine to perform the obligations and undertakings required to be performed by it under this Agreement or under any other contract, agreement, certificate or other instrument that is attached hereto.

15.3 Representations and Warranties of NELLC. NELLC hereby represents and warrants to Aurora Co-op and Aventine that each of the following representations and warranties are true and correct in all material respects as of the date of this Agreement:

A. Organization, Qualification and Power. NELLC is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Kansas, it is duly authorized to do business in the State of Nebraska, and has full power and authority to conduct its business and to own and use the properties and assets owned and used by it.

B. Authority/Validity. NELLC has all necessary power and authority to execute, enter into, and deliver this Agreement and each of the contracts,

agreements, certificate or other instruments that are attached hereto, and has taken all action necessary (including obtaining all requisite authorization from its members and/or board of managers) to perform its obligations hereunder and thereunder and consummate the transaction contemplated herein and therein. This Agreement and each of the contracts, agreements, certificate or other instruments that are attached hereto has been duly executed and delivered by NELLC; are legal, valid, and binding obligations of NELLC; and upon complete execution and delivery will be enforceable against NELLC in accordance with their terms.

     C.     Noncontravention.     Neither the execution nor delivery of this Agreement or any of the contracts, agreements, certificate or other instruments that are attached hereto, nor the consummation of the transactions contemplated herein or therein will: (i) violate or result in a conflict with the Articles of Organization or Operating Agreement of NELLC; (ii) violate any Laws or Regulations to which NELLC is subject; or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel or require any notice under any note, deed, security agreement, mortgage, agreement contract, lease, license, instrument or other arrangement to which NELLC is a party, by which any of its properties are bound, or result in the imposition of a lien or encumbrance upon any of its properties.

     D.     Litigation.     No litigation has been served upon NELLC, or to NELLC's knowledge is threatened with respect to the this Agreement, the Aurora West Subdivision or any action required to be taken by NELLC in connection with any of the transactions contemplated herein, and there are no pending, or to NELLC's knowledge, threatened, actions, suits or investigations with regard to condemnation, zoning, fire, safety, health, environmental or other conditions which relate thereto or would reasonably be expected to have a material adverse affect thereon.

     E.     Third Party Consents.     Except for governmental permits consents or other actions required with respect to zoning, platting, subdivision and construction; actions required to transfer the Irrigation Wells or obtain a permit for their use for industrial purposes, and except for the BNSF approval of the Double Track L and Gravel Service Road, as referenced in Section 4.1 above, no consent of any third party is required in order for NELLC to perform the obligations and undertakings required to be performed by it under this Agreement or under any other contract, agreement, certificate or other instrument that is attached hereto.

# ARTICLE XVI
## TERM

16.1    Term. This Agreement shall commence on August 1, 2006 and unless sooner terminated as provided in Section 17 below, shall continue until January 1, 2011, at which time this Agreement shall terminate.


# ARTICLE XVII
## EVENTS OF DEFAULT

17.1    Events of Default. The following shall be an event of default ("Event of Default") under this Agreement :

A.    The failure at any time of a a Party to make any payment required to be made hereunder when such payment is due and such failure is not cured within ten (10) days following such Party's receipt of written notice of nonpayment from the Party to which payment is due, provided the Party giving the notice of nonpayment is not itself in material breach of this Agreement as between any two of the Parties hereto,

B.    Except for a breach of Sections 2.3., 3.2, 4.5, 5.5 or 6.3 with respect to which the penalties set forth in Article X are the exclusive remedy, the failure at any time of a Party to observe or perform any material obligations or undertakings (other than nonpayment) required to be observed or performed by such Party hereunder provided the Party giving notice of such failure is not itself in material breach of this Agreement as between any two of the Parties hereto, and such failure has not been cured to the reasonable satisfaction of the non-breaching Party within sixty (60) days following such Party's receipt of written notice of such failure from the non-breaching Party; or in the case of a breach that cannot reasonably be cured within sixty (60) days or such longer period as may be reasonable, provided the Party that is in breach immediately undertakes and diligently pursues all commercially reasonable efforts to cure said breach as soon as is possible and provided further that: (i) the Party to which the notice is given is not in breach of more than one of its obligations or undertakings hereunder or thereunder or has not committed two or more breaches, including, without limitation, nonpayment, during the immediately preceding sixty (60) months; or (ii) the failure to observe or perform such covenant or agreement is not likely to result in an imminent financial loss or irreparable injury to the Party giving such notice.

C.    Any Party (i) instituting proceedings to be adjudicated bankrupt; (ii) consenting to the institution of bankruptcy or insolvency proceedings against it; (iii) filing a petition seeking or consenting to any reorganization or relief under any applicable federal or state law relating to bankruptcy or insolvency; (iv) consenting to the appointment of a receiver, liquidator, assignee, trustee,

sequestrator (or other similar official) for a substantial part of its property; (v) making any assignment for the benefit of its creditors; (vi) admitting in writing to its inability to pay its debts generally as they become due; or (vii) taking any corporate action in furtherance of any such action.

17.2    Effect of Event of Default.    Upon the occurrence and continuation of any Event of Default, each non-defaulting Party to whom such performance or forbearance is owed shall have the right to suspend further performance under this Agreement insofar as it relates to any obligation or undertaking that the non-defaulting Party is required to observe or perform for the benefit of the defaulting Party and to pursue such remedies as it shall have available to it at law or in equity.    Except as is expressly provided herein in the case of suspension of performance by the non-defaulting Party, this Master Development Agreement shall, irrespective of any Event of Default, survive and remain in full force and effect as between the Parties and remain enforceable in accordance with its terms.

## ARTICLE XVIII
### FORCE MAJEURE

18.1    A Party's failure to perform the terms and conditions of this Agreement shall not be deemed a breach or a default hereunder or give rise to any liability of such Party to the other to the extent such failure is caused, in whole or in part, by strike, labor unrest, riot, public enemy, fire, explosion, flood or other casualty, drought, insurrection, war, sabotage, accident, any action by any governmental authority or by any other condition, other than insolvency, beyond the reasonable control of such Party.

## ARTICLE XIX
### INDEMNIFICATION

19.1    Aurora Co-op's Indemnification.    Except to the extent the Liabilities, as hereinafter defined, are covered by applicable insurance maintained by Aventine or NELLC, and provided the Party seeking such indemnification has purchased and maintained any applicable insurance coverage that is required to be maintained pursuant to Article XIII above, Aurora Co-op (referred to in such capacity as the "Indemnitor"), hereby agrees to indemnify and hold Aventine and NELLC and their respective officers, directors, shareholders, members, managers, employees, agents and representatives (referred to in such capacity as the "Indemnitee") harmless from and against any and all Liabilities, to the extent the same arise out of or are proximately caused by:  (i) Aurora Co-op's ownership or use of any real property within the Aurora West Subdivision on or after the date of this Agreement; (ii) any action taken or omitted by Aurora Co-op or any its officers, directors, employees, agents, representations, contractees or invitees insofar as the same relates to the construction or operation of any of the improvements required to be constructed or operated by Aurora Co-op hereunder; or (iii) any breach by Aurora Co-op of any representation or warranty given or any covenant, agreement or obligation required to be observed by Aurora Co-op hereunder or in any other contract, agreement,

certificate, instrument or document delivered to Aventine or NELLC by Aurora Co-op in connection herewith.

19.2    Aventine's Indemnification.    Except to the extent the Liabilities, as hereinafter defined, are covered by applicable insurance maintained by Aurora Co-op or NELLC, and provided the Party seeking such indemnification has purchased and maintained any applicable insurance coverage that is required to be maintained pursuant to Article XIII above, Aventine (referred to in such capacity as the "Indemnitor"), hereby agrees to indemnify and hold Aurora Co-op and NELLC and their respective officers, directors, shareholders, members, managers, employees, agents and representatives (referred to in such capacity as the "Indemnitee") harmless from and against any and all liabilities to the extent the same arise out of or are proximately caused by , or are in any way related to:  (i) Aventine's ownership or use of any real property within the Aurora West Subdivision on or after the date of this Agreement; (ii) any action taken or omitted by Aventine or any its officers, directors, employees, agents, representations, contractees or invitees insofar as the same relates to the construction or operation of any of the improvements required to be constructed or operated by Aventine hereunder; or (iii) any breach by Aventine of any representation or warranty given or any covenant, agreement or obligation required to be observed by Aventine hereunder or in any other contract, agreement, certificate, instrument or document delivered to Aurora Co-op or NELLC by Aventine in connection herewith.

19.3    NELLC's Indemnification.    Except to the extent the Liabilities, as hereinafter defined, are covered by applicable insurance maintained by Aurora Co-op or Aventine, and provided the Party seeking such indemnification has purchased and maintained any applicable insurance coverage that is required to be maintained pursuant to Article XIII above, NELLC (referred to in such capacity as the "Indemnitor"), hereby agrees to indemnify and hold Aventine and Aurora Co-op and their respective officers, directors, shareholders, members, managers, employees, agents and representatives (referred to in such capacity as the "Indemnitee") harmless from and against any and all Liabilities to the extent the same arise out of or are proximately caused by , or are in any way related to:  (i) NELLC's ownership or use of any real property within the Aurora West Subdivision on or after the date of this Agreement; (ii) any action taken or omitted by NELLC or any its officers, directors, employees, agents, representations, contractees or invitees insofar as the same relates to the construction or operation of any of the improvements required to be constructed or operated by NELLC hereunder; or (iii) any breach by NELLC of any representation or warranty given or any covenant, agreement or obligation required to be observed by NELLC hereunder or in any other contract, agreement, certificate, instrument or document delivered to Aventine or Aurora Co-op by NELLC in connection herewith.

19.4    Liabilities Defined. As used in this Section 20, "Liabilities" shall include all damages, deficiencies, obligations, assessments, judgments, fines, penalties, costs, expenses (including response costs, remediation expense, consultant fees, reasonable attorneys' fees, expert witness fees or  court costs) and all other losses or expenses of any kind arising out of or in any way connected with any claim, action, suit, proceeding,

investigation or inquiry initiated or undertaken against the Indemnitee by any third Party, whether or not successfully prosecuted.

19.5    Any Indemnitee shall give notice to the Indemnitor within thirty (30) days of the assertion or institution of any claim, action, suit or proceeding if the Indemnitee intends to seek indemnification hereunder, and in the case of a claim relating to a representation or warranty before the expiration of the survival period applicable thereto. Indemnitor shall thereafter have the right to participate, at its sole cost and expense, in the defense, settlement or other resolution thereof, including the right to retain counsel at its own expense to defend, or cooperate in the defense of, any such matter, and the right to consent to any settlement or compromise thereof, provided that such consent shall not be unreasonably withheld.   Notwithstanding the foregoing, in the event that Indemnitee determines, in its reasonable discretion, that there is a reasonable probability that an indemnified claim or proceeding may materially and adversely affect it, other than as a result of money payments required to be reimbursed by Indemnitor pursuant to this Section 20, Indemnitee shall have the right to prosecute the defense, and compromise or settlement of such claim or proceeding, in which case Indemnitor shall not be liable for any money payable under any such settlement.   In any event, Indemnitor, Indemnitee, and their respective counsel shall cooperate in the defense against, and settlement and compromise of, any such indemnified claim or proceeding.    Indemnitor shall pay to Indemnitee any amount owing under this Section 19 within thirty (30) days after (i) the completion of any investigation or inquiry, the settlement or compromise of any claim, suit or proceeding; or (ii) the entry of a final nonappealable order by a court or other body having jurisdiction over the matter.

## ARTICLE XX
## NOTICE

20.1    All notices, demands and communications (a "Notice") under this Agreement shall be delivered or sent by: (a) personal messenger delivery, (b) registered or certified mail, postage prepaid, return receipt requested or (c) nationally recognized overnight carrier, addressed to the address of the intended recipient set forth below or to such other address as eachParty may designate by notice pursuant to this Section. Notices shall be deemed given on the date of such personal messenger delivery, one business day after delivery to the overnight carrier or three business days after being mailed as provided in clause (b) above.

Notices to Aurora Co-op:      Aurora Cooperative Elevator Company
                              c/o George Hohwieler
                              605 12th Street
                              Aurora, NE 68818

| | |
|---|---|
| With a copy to: | L. Bruce Wright<br>Cline, Williams, Wright, Johnson & Oldfather, LLP<br>1900 US Bank Building<br>233 South 13th Street<br>Lincoln, NE 68508 |
| Notices to Aventine: | Aventine Renewable Energy Holdings, Inc.<br>c/o John Gray<br>Vice President Logistics & Development<br>1300 South 2nd Street<br>Pekin, IL 61554 |
| With a copy to: | Kutak Rock LLP<br>The Omaha Building<br>1650 Farnam Street<br>Omaha, NE 68102<br>Attention: Joseph O. Kavan , Esq.<br>Facsimile: (402) 346-1148 |
| | And |
| | Davis Polk & Wardwell<br>450Lexington Avenue<br>New York, NY 10017<br>Attention: Jeffrey I. Wool, Esq.<br>Facsimile: (212) 450-3800 |
| Notices to NELLC | Nebraska Energy, L.L.C.<br>1205 South O Road<br>Aurora, NE  68818<br>Facsimile: (402) 694-4545 |
| With a copy to: | Davis Polk & Wardwell<br>450Lexington Avenue<br>New York, NY 10017<br>Attention: Jeffrey I. Wool, Esq.<br>Facsimile: (212) 450-3800 |

## ARTICLE XXI
## MISCELLANEOUS

21.1    Assignment.  All, but not less than all of the rights and obligations of Aventine under this Agreement may be assigned upon written notice to Aurora Co-op, but without the prior written consent of Aurora Co-op or NELLC to an entity owned or controlled by Aventine and formed for the sole purpose of entering into the transactions

{L0702854.3}                                          - 28 -

contemplated herein, provided, however, that such assignment shall not constitute a novation and Aventine, together with such assignee, shall nevertheless be and for all purposes remain jointly and severally liable to Aurora Co-op and NELLC for full and faithful performance of all of the obligations and undertakings required to be observed and performed by Aventine under this Agreement. Except as provided above, neither Aventine, Aurora Co-op nor NELLC may assign any of their rights or obligations under this Agreement without the prior written consent of the other Parties, which consent will not be unreasonably withheld, conditioned or delayed.

21.2    No Third Party Beneficiaries. This Agreement shall be for the sole benefit of the Parties, their permitted assignees, and their respective heirs, successors, permitted assigns, and legal representatives and is not intended, nor shall it be construed, to give any person, other than the Parties, their permitted assignees, and their respective heirs, successors, permitted assigns and legal representatives, any legal or equitable right, remedy or claim hereunder.

21.3    Choice of Law. This Agreement shall be construed and enforced pursuant to the laws of the State of Nebraska. Any legal action or proceeding with respect to this Agreement or any document related hereto may be brought in the Douglas County District Court located in Omaha, Nebraska or the United States District Court for the District of Nebraska, and in connection with any suit so initiated, the parties, by execution and delivery of this Agreement, hereby accept for themselves, generally and unconditionally, the jurisdiction of the aforesaid courts and do hereby irrevocably waive any objection, including, without limitation, any *forum non conveniens*, which any of them may now or hereafter have to the bringing of such action or proceeding in such jurisdictions. TO THE EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDINGS ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

21.4    Incorporation by Reference. Each of the definitions contained in the recitals set forth at the beginning of this Agreement, and each exhibit or schedule which is referred to herein and which is attached hereto shall be deemed to be incorporated herein and made a part hereof by such reference to the same extent and with the same effect as if the same were set forth herein in their entirety.

21.5    Entire Agreement; Amendments. This Agreement and the Collateral Contracts together with all exhibits and schedules thereto, shall constitute the entire agreement among the Parties pertaining to the subject matter hereof and will supersede and replace all prior contracts, agreements, understandings, negotiations and discussions, whether oral or written, of the Parties in regard thereto.

21.6    Modification or Amendment. No supplement, modification or amendment of this Agreement shall be binding unless the same is reduced to writing and is signed by all of the Parties.

21.7    Waiver.  No waiver of any of the provisions of this Agreement or any breach of any provision of this Agreement shall be deemed to, or shall constitute a waiver of any other provision or breach hereof (whether or not similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly set forth in writing and signed by the Party or Parties against whom enforcement is sought.

21.8    Invalidity.  It is the intention of the Parties that this Agreement and each provision hereof shall constitute a binding and legally enforceable agreement.  If any provision of this Agreement, or any covenant, obligation or agreement contained herein is determined by a court of competent jurisdiction to be invalid or unenforceable, then, unless such determination shall have the effect of depriving either Aventine, Aurora Co-op or NELLC of any material benefit of its bargain, such determination shall not affect any other provision, covenant, obligation or agreement, each of which shall be construed and enforced as if such invalid or unenforceable portion were not contained therein and each such valid and enforceable provision, covenant, obligation or agreement shall be deemed to be effective, operative, made, entered into or taken in the manner and to the full extent permitted by law.

21.9    Interpretations.  Any uncertainty or ambiguity existing herein shall not be interpreted against either Party because such Party prepared any portion of this Agreement, but shall be interpreted according to the application of rules of interpretation of contracts generally.   The headings and table of contents (if any) used in this Agreement are inserted for convenience and reference only and are not intended to be an integral part of or to affect the meaning or interpretation of this Agreement.

21.10   Computation of Time.   Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon any day which is not a business day, the Party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding business day.

21.11   Survival.    Except as is otherwise expressly provided herein, all representations and warranties and all terms, covenants, conditions and agreements set forth in this Agreement which by their terms contemplate or require performance which is to extend beyond or occur after the termination of this Agreement shall not be deemed to expire on termination, but shall instead survive termination and at all time thereafter be and remain in full force and effect and be enforceable as between the parties hereto in accordance with their terms.

21.12   Rules of Construction.  Any uncertainty or ambiguity existing herein shall not be interpreted against either party because such party prepared any portion of this Agreement, but shall be interpreted according to the application of rules of interpretation of contracts generally.   The headings and table of contents (if any) used in this Agreement are inserted for convenience and reference only and are not intended to be an integral part of or to affect the meaning or interpretation of this Agreement.

21.13  Confidentiality.  The parties each agree that all nonpublic information provided to them by the other party hereto and designated as confidential shall be treated by the receiving party with the same degree of care that it provides to its own confidential information and that the party receiving such confidential information shall not use such information for its own benefit or the benefit of any third party or disclose such information to any third party, except to the extent such use or disclosure is necessary to perform or enforce this Agreement or is otherwise required by law or any listing agreement with any national securities exchange.

21.14. Further Assurances.  The Parties hereby agree to take all such further action and to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

Aurora Cooperative Elevator Company

By_____
George Hohwieler, President

Aventine Renewable Energy Holdings, Inc.

By: _____
Ronald H. Miller, President

Nebraska Energy LLC

By: _____
Jerry L. Weiland          , President

STATE OF NEBRASKA          )
                           ) ss.
COUNTY OF _____    )

The foregoing instrument was acknowledged before me this ___ day of _____, 2006, by George Hohwieler, President of Aurora Cooperative Elevator Company.

_____
Notary Public

{L0702854.3}                    - 32 -

STATE OF ___IL___ )
COUNTY OF _Peoria_ ) ss.

The foregoing instrument was acknowledged before me this _1st_ day of _August_, 2006, by Ronald H. Miller, President of Aventine Renewable Energy Holdings, Inc.

OFFICIAL SEAL
JERRY L. RICHARDS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-26-2009

_____
Notary Public

STATE OF ___IL___ )
COUNTY OF _Peoria_ ) ss.

The foregoing instrument was acknowledged before me this _1st_ day of _August_, 2006, by _Jerry L. Weiland_, _President_ of Nebraska Energy, LLC

OFFICIAL SEAL
JERRY L. RICHARDS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-26-2009

_____
Notary Public

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

Aurora Cooperative Elevator Company

By _George Hohwieler_____
George Hohwieler, President

Aventine Renewable Energy Holdings, Inc.

By: _____
Ronald H. Miller, President

Nebraska Energy LLC

By: _____
, President

STATE OF NEBRASKA          )
                           ) ss.
COUNTY OF _Hamilton_       )

The foregoing instrument was acknowledged before me this _31st_ day of _July_____, 2006, by George Hohwieler, President of Aurora Cooperative Elevator Company.

GENERAL NOTARY-State of Nebraska
PAMELA S. TYMA
My Comm. Exp. July 8, 2009

_Pamela S. Tyma_____
Notary Public

STATE OF _____     )
                             ) ss.
COUNTY OF _____      )

    The foregoing instrument was acknowledged before me this ____ day of _____, 2006, by Ronald H. Miller, President of Aventine Renewable Energy Holdings, Inc.


                                 _____
                                   Notary Public


STATE OF _____     )
                             ) ss.
COUNTY OF _____      )

    The foregoing instrument was acknowledged before me this ____ day of _____, 2006, by _____, _____ of Nebraska Energy, LLC


                                   _____
                                   Notary Public