IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AURORA COOPERATIVE ELEVATOR COMPANY,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>AVENTINE RENEWABLE ENERGY HOLDINGS, INC., AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC,<br>　　　　　Defendants. | 4:14-CV-3032<br><br>MEMORANDUM AND ORDER |

　　　This matter is before the Court on yet another dispute in the ever-expanding litigation between these parties: specifically, the Motion for Temporary Restraining Order and Request for Expedited Hearing filed by plaintiff Aurora Cooperative Elevator Company ("Aurora"). Filing 34. Also before the Court is a motion to strike filed by defendants Aventine Renewable Energy Holdings, Inc., Aventine Renewable Energy – Aurora West, LLC (collectively, "Aventine"). Filing 39. For the reasons discussed below, Aurora's motion will be denied, and Aventine's motion will be denied as moot.[1]

## I. BACKGROUND

　　　The Court has set forth many of the facts relevant to this case in a separate order, also entered today. *See* filing 47. The present dispute concerns a portion of the Double Track Loop that has not played a significant part in any of the parties' previous disputes before this Court. A small portion of the Exterior Loop rests on land owned by Nebraska Energy, LLC ("NELLC"), an Aventine subsidiary which operates a separate ethanol plant just east of the Double Track Loop. Filing 36-8 at ¶¶ 3–4; filing 36-5. This sliver of NELLC's land is referred to in the parties' agreements as the "Subject Premises." *See* filing 36-4 at § 1.1.

---

[1] At the hearing on this matter, Aventine objected to two of the exhibits submitted by Aurora, filings 38-27 and 38-28, on relevance grounds. The Court sustained that objection. However, the Court has fully considered these exhibits, and their inclusion would not have affected the Court's decision.

In August 2006, in connection with the execution of the Master Development Agreement, NELLC granted an easement over the Subject Premises to both Aventine and Aurora. Filing 36-8 at ¶¶ 3–4; filing 36-5. That easement granted Aurora and Aventine the right to "construct, maintain, operate, use and replace the Double Track Loop, including, without limitation, an easement of ingress and egress thereto." Filing 36-4 at ¶ 1.1.

As the Court has described in its previous order denying Aventine's motion for injunctive relief, Aurora has been blocking Aventine's access to the Burlington Northern Santa Fe ("BNSF") main line since February 2014. *See* case no. 4:12-cv-3200, filing 46 at 4–5. Aurora has done this by installing locks on a portion of crossover tracks running between the Exterior and Interior Loop and between the Exterior Loop and the BNSF main line. *See* case no. 4:12-cv-3200, filing 46 at 2.

Since then, Aventine has been working to find an alternative route to shuttle train cars between its ethanol plant and the BNSF main line. And by November 2014, Aventine had found a way, or at least a step in that direction.[2] Together with NELLC, Aventine planned to construct a "diamond crossover" track on a portion of the Exterior Loop located on NELLC's land, i.e., on the Subject Premises. NELLC and Aventine's plan included the following undertakings: (1) installing a switch on a portion of the Interior Loop situated on land owned by Aventine; (2) installing a switch on a portion of NELLC's separate tracks, situated on land owned by NELLC and not located on the Subject Premises; and (3) modifying a portion of the Exterior Loop lying on the Subject Premises to create a diamond crossing track that would extend approximately between the first switch and the second switch and cross over the Subject Premises. Filing 36-8 at ¶ 6; filing 36-6. In other words, the diamond crossing would connect the Interior Loop to an existing set of tracks owned by NELLC by intersecting and crossing over a small portion of the Exterior Loop. Filing 36-9 at ¶ 5.

Mark Beemer, the CEO of Aventine Holdings and president of Aventine West and NELLC, states that he personally directed the engineering and construction firms working on the project to ensure that the construction and installation would not require any entry onto land owned by Aurora. Filing 36-8 at ¶¶ 2, 8. And representatives from both firms have averred that the

---

[2] It is still not entirely clear to the Court whether Aventine's new project will actually enable it to connect to the BNSF main line. The way Aventine has described the project, it will simply allow Aventine and NELLC to shuttle train cars between their facilities, over a portion of tracks owned by NELLC and part of the Interior Loop. *See, e.g.*, filing 36-8 at ¶¶ 7, 18; filing 36-9 at ¶ 5. But from the beginning of this dispute, Aurora has acted as if this project will immediately enable Aventine to connect directly to the BNSF main line. For the sake of argument, the Court has assumed that to be the case.

project will not require any work to be performed on land owned by Aurora. Filing 36-9 at ¶ 7; filing 36-10 at ¶ 7.

According to Beemer, the diamond crossing will not cause any significant interference with Aurora's ability to use the Exterior Loop. Filing 36-8 at ¶ 11. Of course, not everyone can use the crossing at once: when Aventine or NELLC would use the crossing to move trains, Aurora would have to wait. Filing 36-8 at ¶ 11; filing 36-9 at ¶ 12; filing 36-10 at ¶ 12. But Beemer averred that, based on his knowledge of the operations of both the NELLC and Aventine plants, such crossings would occur no more than six times a week, with each crossing lasting approximately 1 hour. Filing 36-8 at ¶ 11.

Aventine and NELLC began construction on Friday, November 21, at around 6:00 p.m. Filing 36-8 at ¶ 4; filing 38-32 at ¶ 11. Aventine did not notify Aurora of its intentions. Filing 38-32 at ¶ 12. Aventine does note that the parties have been conducting continuous video surveillance of each other's properties, and Aventine contends that Aurora must have had some awareness that the project was going to begin, based on the equipment that had been arriving and preparatory work that had been conducted in the preceding weeks. Filing 36-8 at ¶ 13. But Aventine and NELLC have admitted that they never bothered to pick up the phone to call Aurora and let them know of their plans. For its part, Aurora denies that it knew or suspected that Aventine or NELLC were about to begin a construction project that would involve a modification of the Exterior Loop. Filing 38-32 at ¶ 12.

In any event, shortly after Aventine was about to begin construction in earnest, Aurora also sprang into action. Around 6:00 p.m. on that Friday, an Aurora employee noticed Aventine personnel beginning to move machinery, equipment, and rocks into position near the Exterior Loop, with the apparent intention of cutting the loop and constructing a crossover track. Filing 38-32 at ¶ 11. Aurora employees also noticed that Aventine had placed several blue flags on the Exterior Loop—a signal to BNSF that the track was out of service. Filing 38-32 at ¶ 13.

In response, Aurora personnel began placing vehicles, equipment, and themselves on the Exterior Loop in an effort to block Aventine's efforts. Filing 38-32 at ¶ 15. Aventine claims that Aurora's response created a safety hazard, as Aurora employees were placing vehicles in unsafe positions, running up to heavy equipment as it was being operated, and attempting to instigate confrontations with members of the construction crew. Filing 36-8 at ¶ 15. At some point, Aurora also called various law enforcement officers to the scene. Filing 36-8 at ¶ 14.

Fortunately, the tense situation deescalated. At around 9:30 p.m. that night, Aurora filed a motion for a temporary restraining order, essentially asking that the Court order Aventine to cease work on the project. Filing 34.

- 3 -

And at around 11:00 p.m., a telephonic hearing was held. Following that hearing, the Court entered an interim order directing Aventine to avoid interfering with Aurora's access to and use of the Exterior Track Loop and to not begin construction or installation of the diamond crossing. Filing 35.

Since then, the parties have had an opportunity to brief the matter and explain how this confrontation arose. Aurora has explained that it found the sudden closure of the Exterior Track Loop to be particularly worrisome because a large BNSF shuttle train had previously been scheduled to arrive at Aurora's facility to pick up Aurora's grain, with the pickup to occur at some time on that Friday, Saturday, or Sunday. And in order for that arrangement to work, the train would have needed access to the Exterior Loop. Filing 38-32 at ¶ 14.

Aventine has explained that it timed the construction in order to minimize disturbances to Aurora, and that construction was intended to be complete by the following Tuesday morning. Filing 36-8 at ¶¶ 8, 18. (It is not clear whether Aventine knew about Aurora's scheduled pickup from BNSF.) Representatives from the engineering and construction firms have averred that the construction would have caused the portion of the Exterior Loop to be inaccessible by rail for between 6 to 10 hours. Filing 36-9 at ¶ 10; filing 36-10 at ¶ 10. And Beemer stated that work on the Exterior Loop would have been completed by Saturday morning. Filing 36-8 at ¶ 8. He avers that NELLC and Aventine had no intention of delaying or obstructing trains on their way to or from Aurora's facility. Filing 36-8 at ¶ 18.

On November 24, 2014, the parties appeared before the Court for a hearing on Aurora's motion, and the matter is now fully submitted and ripe for disposition.

## II. ANALYSIS

When deciding whether to issue a preliminary injunction, the Court weighs the four *Dataphase* factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). A preliminary injunction is an extraordinary remedy, and the movant bears the burden of establishing its propriety. *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also H&R Block Tax Servs. LLC v. Acevedo-Lopez*, 742 F.3d 1074, 1077 (8th Cir. 2014).

Aurora seeks an order prohibiting Aventine and NELLC from "cutting into or otherwise interfering with Aurora Co-op's quiet enjoyment of the Exterior Track Loop in accordance with the terms of the Double Track Loop

- 4 -

Easement and Use Agreement." Filing 34 at 1. The Court finds that Aurora is not entitled to the injunction it seeks. Aurora has not demonstrated a likelihood of success on the merits, nor has it shown a threat of irreparable harm to any legitimate interest. Rather, the balance of the harms weighs against injunctive relief, as does the public interest.

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

Aventine argues that NELLC has the right to build the diamond crossing under the NELLC Track Easement and Use Agreement (the "NELLC Easement Agreement"). The Court agrees. And because Aventine has shown that it and NELLC are acting within their rights under the relevant agreements, Aurora can show little to no likelihood of success on the merits.

In the NELLC Easement Agreement, NELLC granted Aurora and Aventine an

> easement on, over, under and upon that portion of the NELLC Premises[3] that is more particularly set forth on Exhibit B which is attached hereto (the "Subject Premises") to construct, maintain, operate, use and replace the Double Track Loop, including, without limitation, an easement of ingress and egress thereto and the right to use and occupy the NELLC Premises on a temporary basis to the extent necessary to construct, operate, maintain and replace the Double Loop Track[.]

Filing 36-4 at § 1.1. This easement was expressly subject to any conditions set forth in the remainder of NELLC Easement Agreement. Filing 36-4 at §§ 1.1, 4.1. The agreement further provided that Aurora and Aventine "shall have the quiet and undisturbed possession of the Subject Premises during the Term hereof without any interruption by NELLC or any person claiming by, under or through NELLC, except as is otherwise expressly provided herein." Filing 36-4 at § 4.1 (emphasis supplied).

That brings the Court to Article XX of the NELLC Easement Agreement, which governs NELLC's reserved rights. That portion provides, in relevant part:

> NELLC may enter upon the Subject Premises and exercise the following rights without notice and without liability to Aurora Co-op and Aventine for damage or injury to property, person or

---

[3] The "NELLC Premises" refers to NELLC's property adjacent to the Double Track Loop. Filing 36-4 at 1.

>> business and without affecting an eviction or disturbance of the use or possession of Aurora Co-op and Aventine or giving rise to any claim, except as more specifically provided herein:
>
>> . . . .
>
>> B. At reasonable times, and except in the case of emergencies, upon reasonable prior notice and to make at its own expense, repairs, alterations, additions and improvements, structural or otherwise, in or to the Subject Premises or part thereof, and any adjacent buildings, equipment, streets, alleys or other improvements, and during such operations to take into and through the Subject Premises or any part thereof, all materials required, and to temporarily close or suspend operation of entrances or other facilities, provided only that such action shall not have a material adverse effect on the use and right to quiet enjoyment of the Subject Premises by Aurora Co-op and Aventine;
>
>> . . . .
>
>> D. At reasonable times, to take any and all reasonable measures, including inspections or the making of repairs, alterations, additions and improvements to the Subject Premises or to the NELLC Premises that are necessary or desirable for the safety, protection, operation or preservation of the Subject Premises or the NELLC Premises;

Filing 36-4 at § 20.1.

  Aventine contends that NELLC is entitled, under § 20.1(D), to enter onto the Subject Premises and construct the proposed diamond crossing. Aventine argues that the proposed crossing is an alteration or addition that satisfies both prerequisites of § 20.1(D): that it be (1) desirable or necessary (2) for the operation of the Subject Premises or NELLC Premises. The Court finds this to be a sensible reading of the contract, and finds that NELLC has satisfied both prerequisites of § 20.1(D).[4]

---

[4] Aurora argues that, despite its language to the contrary, what § 20.1(D) really means is that any alteration of the Subject Premises must be for the benefit of the Subject Premises,

Aventine has submitted uncontested evidence that NELLC's ethanol facility—and thus the NELLC Premises—will benefit from the diamond crossing. With the crossing, NELLC will be able to shuttle railcars and material between its facility and Aventine's facility. Filing 36-8 at ¶ 7. NELLC finds that to be a benefit to its facility, and Aurora is not in a position to claim otherwise. And because the NELLC Premises will benefit from these alterations, NELLC is entitled to include that this alteration is, in fact, "desirable." Aurora argues that Aventine is the moving force behind the project, and that NELLC's claimed benefits are a mere pretext. But Aurora has not contradicted NELLC's evidence, which shows that NELLC will also benefit from the project. "Desirable" is not a high bar to clear—and NELLC is allowed, under the agreement, to make alterations that it has reasonably deemed desirable.

Even if the project were not authorized under § 20.1(D), the Court finds that, moving forward, NELLC's proposed construction is also authorized by § 20.1(B). That section authorizes NELLC to make alterations or additions to the Subject Premises, even without a showing of a benefit to the NELLC Premises, provided that NELLC gives Aurora reasonable notice, and provided the project does not have a materially adverse effect on Aurora's right to the use and quiet enjoyment of the Subject Premises. The modification of the tracks themselves will not significantly affect Aurora's ability to use the Subject Premises—so long as Aventine and NELLC provide Aurora with reasonable notice of any construction project, and so long as any resulting downtime of the Exterior Loop does not significantly interfere with Aurora's business. And the Court finds that the proposed use of the new crossing by Aventine and NELLC—for a total of approximately 6 hours each week—cannot, by any stretch of the imagination, be considered "materially adverse" to Aurora's right to the use and quiet enjoyment of the Subject Premises.

Aurora has raised a number of counterarguments. The Court has considered them all, and finds each to be without merit. The Court does not find it necessary to separately address each argument in this Memorandum and Order, and will only expressly address a few of them.

Aurora argues that Aventine's usage of the Exterior Track Loop is governed by the Double Track Loop and Use Agreement (the "Double Loop Agreement"). Aurora points to a portion of that agreement which provides

---

and that it is not enough if the alteration benefits the NELLC Premises. Filing 37 at 12. But Aurora's argument is contradicted by the plain language of § 20.1(D), and moreover, makes little sense. The NELLC Premises belong entirely to NELLC. NELLC does not need an exception in its easement agreement to permit it to do things on portions of its own land that are not subject to the easement.

that "[t]he Exterior Track Loop and the switches and crossovers between the BNSF main line and the Exterior Track Loop shall generally be reserved for the exclusive use of Aurora Co-op . . . ." Filing 38-3 at § 3. NELLC was not a signatory to this agreement. And although Aventine was, the Double Loop Agreement poses no obstacle to NELLC or Aventine's construction efforts, nor to their proposed future uses of the crossing.

First, the Double Loop Agreement may govern the usage of the Double Track Loop generally, and the parties' rights and obligations with regard to the tracks themselves. But that agreement is not the primary source of the parties' rights and obligations with respect to land owned by NELLC. Rather, the crossing at issue lies on the Subject Premises, which is governed primarily by the NELLC Easement Agreement. Aventine has a right to enter upon the Subject Premises by virtue of that agreement. NELLC granted both Aurora *and* Aventine an easement, and Aurora cannot interfere with Aventine's use and enjoyment of that easement any more than Aventine can interfere with Aurora's use and enjoyment.

Second, as to the tracks themselves, the proposed construction or use of the crossing will not violate the Double Loop Agreement. To the extent that *crossing over* a single portion of the Exterior Loop can even be considered a "use" of the Exterior Loop, the Exterior Loop will "generally" (and in fact, for the overwhelming majority of the time) remain available for Aurora's exclusive use. Aventine proposes to cross over the Loop for a total of 6 hours a week, which leaves the remaining 162 hours each week (96 percent of the time) for Aurora.

Aurora next argues that Aventine has breached the Double Loop Agreement by modifying the Interior Loop. Filing 37 at 9–10. Aurora first claims that the Double Loop Agreement does not permit any alterations to the Double Track Loop. But Aurora fails to cite to any portion of the agreement for this broad proposition. Instead, Aurora points to a provision (§ 12) that grants the parties easements over each other's land to inspect, maintain, repair, or replace portions of the track loop that each party is required to inspect and maintain under the agreement. Filing 38-3 at § 12. Under that section, Aurora points out, Aventine has the right to "inspect, maintain, repair, and replace"—but not to alter—the Interior Track Loop.

But that section is not applicable to this dispute, nor will its text bear the reading that Aurora seeks to force upon it. Section 12 of the Double Track Loop Agreement concerns the parties' rights and obligations when engaged in construction or repair activities that require them to enter into land held by the *other* party. That says nothing about what they may do to their own property. And in any event, Aventine has presented uncontested evidence that none of its activities are taking place on land owned by Aurora.

Aurora next points to § 3.1 of the NELLC Easement Agreement, which provides that:

> [f]or and during the Term of this Agreement, use of the Subject Premises by Aurora Co-op and Aventine pursuant to this Agreement and the easement granted herein shall be limited to the construction, maintenance, operation, use and replacement of the Double Track Loop and for other purposes which are a <u>usual and customary part thereof or incidental thereto, and for no other purpose</u>.

Filing 36-4 at § 3.1 (emphasis supplied). But the Court does not see anything about § 3.1 that poses a problem for Aventine. Using a portion of the Exterior Loop to move railcars to and from the Interior Loop would certainly be an "usual and customary" use of a railroad track generally, and the Double Track Loop in particular.

Finally, Aurora points to cases from other jurisdictions for the general proposition that, while the fee owner can use the easement located on its land in ways that do not interfere with the easement owner's use, the rule is different for railroad easements, which give the easement owner the right to exclusive use of the servient premises—even as against the fee owner. *See, e.g.*, *State v. Beeson*, 232 S.W.3d 265, 276–77 (Tex. Ct. App. 2007). That is all well and good. But here, the language of the easement itself reserves certain rights to NELLC, including the right to construct and use the diamond crossing. Aurora's railroad easement has never been exclusive, and has always been shared with Aventine and NELLC.

In sum, Aurora has shown little likelihood of success on the merits *of this issue*. But Aurora (and Aventine) should bear in mind that the matter before the Court really is a narrow issue: whether NELLC and Aventine can build a small crossing, and then use that crossing briefly each week to move rail cars to and from NELLC's property. If Aventine or NELLC's usage of the crossing begins to materially interfere with Aurora's usage and enjoyment of the crossing, or if they seek to expand their operations onto the Exterior Loop, then Aurora might very well be entitled to relief, in the form of an injunction or money damages, or both.

### B. IRREPARABLE HARM

To show a threat of irreparable harm, the movant must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *Roudachevski*, 648 F.3d at 706. Stated differently, the irreparable harm alleged by the movant "must be actual and not theoretical." *Brady v. Nat'l Football League*, 640 F.3d 785, 794 (8th Cir.

2011). And harm is not irreparable when a party can be fully compensated for its injuries through an award of damages. *Gen. Motors Corp. v. Harry Brown's, LLC,* 563 F.3d 312, 319 (8th Cir. 2009).

Aurora claims that, absent the requested injunction, it will be irreparably harmed in two ways. First, Aurora briefly attempts to rely on the general proposition that (in some circumstances) trespass or injury to real property is considered an irreparable harm. *See, e.g.*, *F. Burkart Mfg. Co. v. Case,* 39 F.2d 5 (8th Cir. 1930). But Aurora cites only one case in support of its position: *O'Connor v. Kaufman,* 616 N.W.2d 301, 310 (Neb. 2000). *Kaufman* is readily distinguishable. In that case, the easement granted the dominant parcel certain access to a water well. The owners of the servient parcel had removed the well, completely frustrating the purpose of the easement. *See id.* at 306. Here, by contrast, Aurora retains near-complete use of its easement—subject only to limited and transient interruption when Aventine or NELLC seek to cross the track. The Court is not convinced that this slight use of the easement shows per se irreparable harm. Neither the track (nor the Subject Premises) are actually being injured (only upgraded). And Aventine is crossing land owned by NELLC on an easement it shares with Aurora—so there is no trespass.

Aurora's real argument is that if Aventine can access the BNSF main line it will undercut the leverage Aurora has tried to exert over Aventine by means of its blockade.[5] Filing 37 at 16. This leverage, Aurora insists, has been part and parcel of the parties' contractual relationship from the very beginning. Aurora points to the fact that Aventine's access to the Exterior Loop under the Double Loop Agreement is conditioned on the existence of an exclusive grain supply agreement with Aventine. Aurora maintains that it needs this leverage in order to be certain that Aventine maintains a strong incentive to abide by its obligations under the Grain Supply Agreement. So, Aurora argues, if Aventine is allowed to evade the blockade, Aurora will be "entirely deprived of the benefit of the bargain that was built into the overall agreement with Aventine." Filing 37 at 16. And this harm, according to Aurora, would be "tremendous and impossible fully to calculate." Filing 37 at 16.

Aurora's argument has a gap—the same gap that has existed, from the very beginning, in the Double Track Loop itself. Aurora never owned *all* of

---

[5] Again, it is not clear that the current project will actually enable Aventine or NELLC to access the BNSF main line, or if it is simply one step in a larger plan toward that ultimate goal. If the current proposed undertakings will not result in direct access, then Aurora's claimed irreparable harms are not only reparable but also not sufficiently imminent to warrant injunctive relief. For the sake of argument, the Court will assume that the current project will (or will soon) enable Aventine to connect to the BNSF main line.

the real estate surrounding Aventine. From the beginning, NELLC owned a portion of the southeast corner. It is true that, when the parties' agreements were signed in 2006, what would become Aventine's parcel was not connected to the BNSF main line. But nothing in the parties' agreements forbade NELLC or Aventine from taking steps to change that.

At the hearing on Aurora's motion, the Court repeatedly asked Aurora to explain how the loss of this leverage amounted to an irreparable harm that could not be compensated by money damages. Aurora did not provide a convincing response. The leverage Aurora seeks to exert bears upon a number of complex commercial relationships between itself and Aventine. While those commercial relationships—from the Grain Supply Agreement to the real estate option that Aurora seeks to exercise—may be complex, they all deal with quantifiable commodities and profits. At this time, Aurora has not shown an imminent threat of irreparable harm.

### C. REMAINING *DATAPHASE* FACTORS

The Court need not dwell long on the remaining *Dataphase* factors. Failure to show irreparable harm is an independently sufficient ground upon which to deny a temporary restraining order. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003); *see also Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 893 (8th Cir. 2013). That said, the remaining factors also counsel against granting Aurora the injunction it seeks.

The balance of harms does not favor Aurora. Aurora has shown only that it will lose leverage it seeks to exert over Aventine. Whether this will actually result in any concrete detriment to Aurora remains to be seen. In other words, Aurora's harm is speculative at best. But if the injunction is issued, other parties—namely, NELLC—will face immediate, concrete harm. As the project is delayed, NELLC continues to accrue costs. Filing 36-8 at ¶ 16. And if the project is not complete by November 26, 2014, NELLC may be forced to reduce ethanol production rates, as by then it will have reached its full ethanol storage capacity. Filing 36-8 at ¶ 16. These actual, imminent losses (even if somewhat self-inflicted) outweigh the speculative harms posited by Aurora.

Finally, the public interest is better served by allowing the crossing project to continue. Aurora is the sole beneficiary of an NELLC shut-down. The public is better served by allowing NELLC's ethanol facility to remain productive. And the public interest is also served when businesses are able to make efficient use of all available means of transportation. This public interest is also Nebraska's official public policy. By statute, Nebraska law favors allowing railroads—even private railroads—to cross one another where needed.

> Each owner of a railroad may cross, intersect, join, and unite its railroad with any other railroad at any point on its route and upon the grounds of the owner of such other railroad with the necessary turnouts, sidings, and switches and other conveniences in furtherance of the objects of its connection.

Neb. Rev. Stat. § 75-428; *see also* Neb. Rev. Stat. § 75-402(2) (defining "railroad" as any railroad track located within the State of Nebraska).

### III. CONCLUSION

At this time, Aurora is not entitled to injunctive relief. The proposed crossing will not result in any significant interference with Aurora's protected interests. And the fact that Aventine has possibly improved its bargaining position does not entitle Aurora to injunctive relief. But Aventine has no cause for celebration. In case it has not been made abundantly clear, the Court's patience is running thin for all parties involved. Much of this dispute—or certainly its unneeded urgency—could have been avoided with a few simple phone calls between the parties. Moving forward, the Court expects that the parties will endeavor in good faith to work out their differences in more reasonable, responsible, and productive ways. Until the parties have finally resolved their various disputes, they will remain neighbors, and as such, they must find a way to get along without police or Court intervention on a routine basis.

THEREFORE, IT IS ORDERED:

1. Aurora's Motion for Temporary Restraining Order (filing 34) is denied.

2. Aventine's Motion to Strike (filing 39) is denied as moot.

Dated this 25th day of November, 2014.

BY THE COURT:

*John M. Gerrard*
John M. Gerrard
United States District Judge